**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 99

September Term, 2016

_____

EARL SYLVESTER COUSINS

v.

STATE OF MARYLAND

_____

Arthur,
Leahy,
Thieme, Raymond G., Jr.,
    (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Arthur, J.

_____

Filed:  February 1, 2017

On the day before his robbery trial was to begin in the Circuit Court for Baltimore County, Earl Sylvester Cousins asked to discharge his court-appointed counsel. In accordance with Md. Rule 4-215(e), the court allowed Mr. Cousins to explain the reasons for his request, but found that he did not have good cause to discharge counsel. The court proceeded to inform Mr. Cousins that the trial would proceed as scheduled and that he would have to represent himself if he discharged his counsel. Mr. Cousins said that he would discharge his counsel and represent himself.

When the trial began the following day, Mr. Cousins announced his intention to disrupt the proceedings, and he engaged in a profanity-laden tirade against the judge. The court ordered that he be removed from the courtroom, but offered him the opportunity to return if he agreed to behave in a civil fashion. Mr. Cousins did not agree.

The jury convicted Mr. Cousins of robbery, and the court sentenced him to 15 years' imprisonment.

## QUESTIONS PRESENTED

Mr. Cousins presents two questions for our review:

I. Did the trial court abuse its discretion in finding that [Mr. Cousins] lacked a meritorious reason to discharge counsel, including that it failed to conduct any inquiry into a possible conflict after assigned counsel said he was conflicted?

II. Did the trial court err when it removed [Mr. Cousins] from the courtroom during his trial without providing him with any means to monitor the proceedings?

We affirm.

## FACTS AND LEGAL PROCEEDINGS

On September 13, 2014, Mr. Cousins entered the First Mariner Bank on Loch Raven Boulevard in Baltimore County and surveyed his surroundings. A teller asked Mr. Cousins if he needed help, and he replied that he was looking for his grandmother. Then he exited the bank.

Approximately 45 minutes later, Mr. Cousins returned with a second man. One of the men approached the teller and asked her to make change. The other approached another teller and said, "I want everything you got in your drawers, don't give me a dye pack, don't give me bait money and I've got a gun so don't make me use it[.]"

Footage from the bank's surveillance system, which showed the incident, was played in court, and still photographs from the surveillance cameras were introduced into evidence. A teller identified Mr. Cousins as the man who robbed her. A detective identified Mr. Cousins based on his detailed review of the surveillance footage, photographs of Mr. Cousins, and time that he spent interviewing Mr. Cousins.

Baltimore County detectives arrested Mr. Cousins and interviewed him regarding the robbery. A video-recording of the interview was played for the jury. In the recording, Mr. Cousins told the detectives that he committed the robbery with a man named Nelson. Mr. Cousins explained that he was addicted to drugs and that he committed the robbery to obtain money to buy drugs. Mr. Cousins identified Nelson and

himself in photographs. A detective testified that he also interviewed Nelson and learned that the two were "associates."

We shall provide additional facts as necessary in our discussion of each of the issues presented.

## DISCUSSION

### I. Mr. Cousins' Request to Discharge Counsel

#### A. February 5, 2015, Postponement Hearing Before Judge Cahill

Mr. Cousins first expressed disagreement with his appointed counsel at a hearing on February 5, 2015, at which defense counsel requested a postponement. Mr. Cousins stated that he did not agree to the postponement. He said, "I'm ready for trial today for real. I don't even need him [defense counsel] . . . I'm ready to go and I have a lawyer and it ain't him . . . John Deros is my lawyer now." Apparently addressing the prosecutor, Mr. Cousins added, "How do you like that, asshole?"

The court granted the postponement, and advised Mr. Cousins to "tell Mr. Deros the trial is now April 7, 2015."

#### B. March 25, 2015, Hearing Before Judge Cahill

By the time of a subsequent hearing on March 25, 2015, private counsel had not yet entered an appearance. At that hearing, Mr. Cousins's appointed counsel expressed concern over his ability to communicate with his client and requested a competency evaluation:

> [DEFENSE COUNSEL]: … I'm asking Your Honor to enter an
> Order for an examination for competency as well as criminal responsibility
> as long as I'm having him evaluated. You may recall our last appearance

3

before Your Honor when the matter was postponed on the last trial date. Mr. Cousins had some choice words for Mr. Cox [the prosecutor]. . . . Over the course of the last month to six weeks, Mr. Cox and I have been attempting to resolve some discovery issues, most of which have been resolved and as I collected that discovery . . . I have gone to see my client and review those with him. Those conversations deteriorate to the point where I'm not, I don't believe that Mr. Cousins, it deteriorates to the point where he's not a meaningful participant in one, reviewing the discovery with him and two, being able to participate in strategy decisions or litigation. . . . But based on the demeanor, I think it's important to have him evaluated so that if there's something we can do to, to help him be a meaningful participate, participant in, in trial preparation and litigation, I'd, I'd rather have that done before we did anything else.

Later in the proceedings, Mr. Cousins explained that the case had previously been postponed and that he was supposed to get another attorney, but that this had yet to happen. The following colloquy between Mr. Cousins and the court ensued:

[MR. COUSINS]: I seen my attorney and every time I see him, it's the day before trial, okay? Now, we was going in front of Judge Ensor, right? If you don't have everything that you need for the case, then that's a discovery violation. Don't get mad at me when I ask you for certain things. I like to go over things concerning my case because when it's all over with, I'm the one in prison, he's the one home with his family, you know what I mean? I've been in prison twenty-five years, it ain't, it ain't a pretty feeling, right? But don't tell me no lie, tell me anything get mad when I question what's having something to do with me, you know? I don't be disrespectful to you. I was trying to talk to you in the bullpen, you walked away from me. You want me to respect you, I respect you but don't tell lies and don't think that you going to do anything to me because I'm not going to let you do that to me.

[COURT]: All right. Easy, Mr. Cousins. Let me ask you this. You just referred to the fact that you had another attorney entering an appearance?

[MR. COUSINS]: I was trying to get a, John (inaudible) and they talked, I don't know what's going on with it.

[COURT]: Well, did you hire Mr. Diros (phonetic)?

4

[MR. COUSINS]: I was trying to.

[COURT]: Okay.  It would be exceedingly unwise, in my professional judgment, for you to discharge [defense counsel] at that, at this point in time, when discovery is being exchanged and he, in my independent judgment, is trying to look out for your best interest.  But if you're, are you asking to discharge [defense counsel] at this point in time?

[MR. COUSINS]: Yes, sir.  Yes, sir.  I'm asking --

[COURT]: Okay and, and then you would be left without a lawyer, is that what you want to do?

[MR. COUSINS]: I'd be left without a lawyer.  If I'm going to give myself, I can get myself some time, I can throw myself on the mercy of the Court because we are not seeing eye to eye okay?

[COURT]: Okay.

[MR. COUSINS]: And you know --

[COURT]: Is there any other reason, aside from what you've expressed, to support your request --

[MR. COUSINS]: Well, how do I, how do I communicate with somebody who don't want to communicate with me? I can't walk out the County jail and say, hey, I want, I call your office, you come and see me three times, and its [sic] every time before Court date.  You don't come and see me, I'm right down the street from you.  You got mad yesterday, I can't watch the videos, I don't have the pictures, all I have is police reports and some other stuff, you know, I don't have the things that I'm supposed to have.  I filed my Motion for discovery, I filed for bail review, I filed for the things I needed, you know, I don't have none of them.  I don't have no responses to that . . .

Defense counsel argued that the court should not rule on Mr. Cousins's request to discharge counsel until it had resolved the issue of competency.  The court agreed:

[DEFENSE COUNSEL]: I would think that should the evaluation come back that he's competent and, and the Court wants to address that again, that is absolutely appropriate but this is too serious a matter to leave him without counsel, at least at this junction.

5

[COURT]: Couldn't agree more. So at this point in time, based on the limited colloquy that we've had on the bench, or from the bench I should say, I do not find that there are good reasons or meritorious reasons to support a discharge of [defense counsel] and the Office of the Public Defender. That's a, that's a matter that I can take up again down the road but I'm going to deny any request, to the extent that I must under Maryland law, complicated as it is, interpret what you said and request a discharge at this time, that request is denied. I'm going to grant the request to postpone the trial in this case.

The court concluded the proceeding by indicating that it would "sign the Order for examination for competency to stand trial, criminal responsibility."[1]

## C.    May 28, 2015, Motions Hearing Before Judge King

After finding Mr. Cousins competent to stand trial on May 28, 2015, the court heard pretrial motions, which included a motion to suppress Mr. Cousins's recorded statement to the police. The recording of Mr. Cousins's statement was played and transcribed into the record. In the statement, Mr. Cousins admitted that he had been using large amounts of cocaine and heroin, that he was intoxicated when he committed the robbery, and that he committed the robbery to obtain money to buy drugs.

Appointed counsel, who was still representing Mr. Cousins, argued that the court should suppress the statement because Mr. Cousins did not give a knowing and voluntary waiver of his *Miranda* rights. He maintained that Mr. Cousins's admission to recent and extensive drug use, in addition to his demeanor while making the statement,

---

[1] Mr. Cousins does not challenge the court's conclusion that he lacked a meritorious reason to discharge his appointed counsel at the hearing on March 25, 2015.

demonstrated that he was intoxicated or in withdrawal and that his statement could not have been voluntary.  The court denied the motion.

### D.	February 1, 2016, Motions Hearing Before Judge Cahill

On February 1, 2016, the day before the trial was to begin, the court held a hearing to address a letter that Mr. Cousins had written to the court.  Before the court read the letter into the record, it asked Mr. Cousins if he wished to discharge his counsel.

Mr. Cousins responded by complaining of defense counsel's failure to introduce a portion of his police interview during the motions hearing on May 28, 2015.  The portion of the interview in question showed him lying on the floor for several hours, asleep or unconscious, in a manner consistent with intoxication or withdrawal.  Specifically, Mr. Cousins said:

> [T]he issue that I'm bringing towards the Court was we had a Motion hearing and we were shown, the disc was shown concerning the police interrogation and the whole disc was not shown, parts was withheld and the parts (inaudible) showing me high, sick, laying on the floor with a sheet wrapped around me.  Now if you're going to show the disc, if you're going to show what happened at the arrest, then show the whole disc . . . .  You know, and it deals with my arrest too, and I was high and if you going to withheld something, that's prosecutor misconduct.  My attorney know what was withheld from the Judge and I wrote Judge King and as far as him trying not to go in front of Judge King.  Judge King even said, if we have any other problems or anything, bring it to him.  Okay?  I asked him to go back to him and let him know . . .  If you're going to show the disc, show the whole disc (inaudible) and to say we're going to trial for the 13th case,[2] no, no, no, we ain't going nowhere.  This man is not going to represent me.  If you're going to give me a trial, give me a fair trial, don't show what you want to show.  The whole disc deal with my arrest and that's where I'm at with that and let's go over this, let's go over, let's show the disc, let's show

---

[2] The "13th case" refers to this case, which involved a robbery that occurred on September 13, 2014.  The State had indicted Mr. Cousins for several other robberies on several other dates.

what he redact from the disc and let's take it in front of the Motion Judge. That's have a fair trial. If we're going to have a trial, have a fair trial, you know?

The court read Mr. Cousins's letter into the record. Mr. Cousins's grievances included these:

1. The prosecutor had withheld a portion of the video-recording that was shown to the motions court. The part of the recording shows him on the floor with a sheet wrapped around him, withdrawing from drugs.

2. On the day he used profanity in addressing the prosecutor, he had asked to represent himself, and asked his attorney whether there were "any prints," but his attorney said "no."[3]

3. He said, "I don't need [defense counsel] to get me life. I could get myself that and that's when I cussed [the prosecutor] and [defense counsel] out."

4. He "spent twenty-three years in prison because [he] had ten whites, two blacks and all from your County."

5. He wanted to call various attorneys and the judge from the May 28 motions hearing to be witnesses at a hearing at which he would play the full, three-hour recording.

After the court read Mr. Cousins's letter into the record, it reminded Mr. Cousins of his right to counsel:

Lawyers, [defense counsel] included, are experts in preparing defenses and challenging the State's proof and the manner in which it was gathered. Attorneys are experts in negotiating pleas, presenting Motions, sitting next to you and trying the case if necessary, advising you on how and whether to present defenses and if you are found guilty of an offense and presenting mitigation to the Court that might lessen your punishment.

---

[3] We see nothing to indicate that fingerprints were an issue in this case. Fingerprints may have been an issue in an earlier case in which Mr. Cousins was convicted. *See infra* n.4.

The court asked Mr. Cousins if he had "any other complaints about [defense counsel]?" Mr. Cousins replied:

> Yes, sir. Basically, you know, to, to even talk about starting tomorrow, right? . . . you take the disc itself, you know. If you're going to show the Motion, let's show the Motion and let's show the Judge everything that deal with the Motion. You going to start a trial and you're going to withheld [sic] something from the Motion, Judge, that's denied me a fair trial. I'm on the floor high. He testified that, that the detective over there testified when he arrested me I looked to be defeated. You know, he didn't get on the record and state that I was high. He knew I was high. I was under the influence of drugs during the interrogation. He also said that I looked defeated and I just looked (inaudible). I was arrested in, in west Baltimore on the City streets, drug syringe in my pocket, cocaine in my pocket and I'm high on that tape. High as a god damn kite, you know what I mean? And he tried to get me life, he want to give me life so he say, right? . . . Let's go in front of Judge King and show this part that he redacted from the tape and then we can start trial. And I'm actually representing myself because I don't need him to get me life. I really don't. I can get myself life. I can say, hey, Judge Cox, come on let's have a kangaroo court like we had before, you know? I don't need no lawyer to get me life, Your Honor. I had twenty-five no parole. I know the games this man play. He lied about a fingerprint report. It wasn't no fingerprint when I cussed him out in Court.[4] It wasn't none of that, you know. And I still don't have all the information.

Shortly thereafter, Mr. Cousins said, "I don't even think I can get a representation out of this man in the conflict that we have, ain't no coming back from that, man. You know, ain't no coming back from that."

When the court asked defense counsel to respond, he addressed the alleged "conflict," which involved a complaint to the Attorney Grievance Commission. The

---

[4] Based on our review of the record, it appears that Mr. Cousins was accusing the prosecutor, not his defense attorney, of playing games and lying about fingerprints. The alleged lie appears to have occurred in a previous criminal trial that resulted in Mr. Cousins's incarceration.

complaint, which was dismissed after Mr. Cousins's trial but before his sentencing, appears to have concerned his counsel's failure to attempt to play the three-hour video-recording in its entirety, including the lengthy portions that depicted Mr. Cousins while he was unconscious or asleep, at the suppression hearing. Defense counsel said:

> [T]he Attorney Grievance matter has been pending since late November, early December, and that's tied my hands as far as being able to communicate with my client towards the possibility of reopening the Motions to try and make the record he's asking me to make. The record of the Motion, there is a record at the Motions, there were somethings played, there were some things that were not played. The officers were cross[-]examined. My hands are tied to, to the extent that, you know, I'm kind of in this, this limbo with the grievance pending. Now, if the grievance hadn't been filed or had been cleared up, I would have an opportunity to talk to my client with an eye towards deciding whether or not we wanted to reopen Motions on his request. This is a very serious, these are very serious matters. There's five separate incidents, any of which could subject Mr. Cousins to life without parole.

Earlier in the hearing, defense counsel stated that he was ready to go forward with trial the following day, but would not be able to do so unless the grievance was settled. Later, however, counsel stated that he would like to take every opportunity to continue to represent Mr. Cousins. Although the grievance had been pending for at least two months ("since late November, [or] early December" of 2015), and the trial was scheduled for the following day, appointed counsel had not moved for leave to withdraw his appearance under Md. Rule 4-214(d).

The State made it clear that the portion of the recording in question depicted Mr. Cousins once his police interview had concluded. The recording equipment continued to run because Mr. Cousins remained in the interview room after the questioning had ended.

10

In the State's view, the rest of the video was irrelevant to the motion court's determination.

In his description of the portion of the recording that had not been shown to the motions court, defense counsel observed that it was "a couple hours" long and that the detectives had re-entered the room to have Mr. Cousins identify a picture. Defense counsel could not "tell if [Mr. Cousins was] asleep or just lying on the floor with a blanket over him[.]"

In ruling that it did not find a meritorious reason for Mr. Cousins to discharge his appointed counsel, the court explained:

> I certainly do not believe that there's any meritorious reasons for a discharge of [defense counsel] based on the information that has been presented here and I will make that finding on the record. Now, I am duty bound to advise you, Mr. Cousins, since I do not find any reason at all, meritorious or otherwise, that, that is intelligible, to allow you to discharge [defense counsel]. But I still can't legally prevent you from discharging or firing him. You have the absolute right to represent yourself, but if you fire [defense counsel], this trial will proceed as scheduled. I've heard no reason to think that a postponement would be in order under the circumstances
>
> *        *        *        *
>
> So you can fire him, but then you're going to be standing there picking a jury tomorrow by yourself.

Before the court asked Mr. Cousins for his final decision regarding the discharge of his counsel, the following exchange ensued, beginning with Mr. Cousins's concern about the video:

> [MR. COUSINS]: You ruled on it and you ruled it on something you haven't even seen, that's basically, and we was in front of Judge King, okay? And my reason was asking for the witness that I had, who was attorneys at law and was there to review the tape as it was playing in Court,

right?  Of course, [the prosecutor] going to make everything where he want it to be and I still say he's a liar and he's a crook and he's a cheat and he's a piece of shit and I will tell him that in his face.

[COURT]: Okay.  Well, that, that's enough.  I've made my ruling.

[MR. COUSINS]: [Defense counsel] is a piece of shit and a liar too.

[COURT]: You can discharge [defense counsel] if you wish.

[MR. COUSINS]: And I discharge [defense counsel], and that, that police over there is a liar and a piece of shit.

[COURT]: You would be extraordinarily –

[MR. COUSINS]: (inaudible) asshole.

[COURT]: You would, you would, it would, it would not be in your interest to discharge [defense counsel].

[MR. COUSINS]: (inaudible) he's discharged and may you have a blessed day, asshole.

[COURT]: Wait a minute. . . . Keep him right there.  Do you wish to fire [defense counsel]?

[MR. COUSINS]: Yes, I wish to fire [defense counsel].

[COURT]: If, if, if you do that, you are going to be standing in front of a jury box tomorrow with twelve people.

[MR. COUSINS]: Guess what?  That's a fair trial.  That's a fair trial.

[COURT]:  Okay.

[MR. COUSINS]: At least I know where I stand at.

[COURT]: And that's what you wish to do?

[MR. COUSINS]: Yes, I'd rather have nobody than to have somebody who ain't for me and I'd rather be tried.

[COURT]: Okay.

12

[MR. COUSINS]: Put your hood on tomorrow, asshole.

[COURT]: . . . [I] am finding that you knowingly, voluntarily waived your right to counsel.

[MR. COUSINS]: That's right, I waived my right to counsel.

[COURT]: So you don't get to change your mind about that. . . . .

[COURT]: You're going to be picking a jury tomorrow, do you understand that, sir?

[MR. COUSINS]: I'm ready to go to trial without att [sic], I don't have an attorney, okay?  I have two State's Attorneys.

In his parting words, Mr. Cousins told the court, "And I don't have a State's Attorney.  I have an asshole trying to try me.  ([I]naudible) [Prosecutor], and you're still a dickhead."

The trial commenced the following morning.

## II.    Good Cause to Discharge Counsel

In his brief, Mr. Cousins writes that he sought to discharge counsel because of (1) counsel's failure to introduce the portion of the video-recording from his police interview during the motions hearing and (2) the breakdown of his relationship with his counsel, which included the grievance that he filed.  Mr. Cousins contends that the trial court abused its discretion in its February 1, 2016, ruling that he did not have a meritorious reason to discharge his counsel and in not appointing substitute counsel.[5]  We reject this contention and hold that the trial court satisfactorily complied with Rule 4-215(e).

---

[5] Mr. Cousins's challenge is confined to the court's ruling on February 1, 2016.

**A. The Applicable Legal Principles**

A defendant in a criminal case has the right to counsel. U.S. Const. amend. VI.; Md. Const. Declaration of Rights, Art. 21. But even though an indigent defendant has a right to appointed counsel, that right does not afford an indigent defendant the right to select the appointed counsel of his or her choice. *See Dykes v. State*, 444 Md. 642, 648 (2015). Nor does this right "give an accused an unfettered right to discharge current counsel and demand different counsel shortly before or at trial." *Fowlkes v. State*, 311 Md. 586, 605 (1988). "[A] defendant may not manipulate this right so as to frustrate the orderly administration of criminal justice." *Id.*`

An indigent defendant may waive the right to assistance of counsel and choose to represent him- or herself. *Williams v. State*, 321 Md. 266, 270 (1990). "A defendant has a right to self-representation, but it may be unwise to exercise that right." *Dykes*, 444 Md. at 646. Courts will indulge every reasonable presumption against a defendant's waiver of appointed counsel. *Id.* at 648.

"Maryland Rule 4-215 implements a defendant's right to waive counsel, and incorporates safeguards to ensure that the defendant is acting knowingly and voluntarily in making that choice." *Dykes*, 444 Md. at 651. The rule provides:

> (e) Discharge of Counsel--Waiver. If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request. If the court finds that there is a meritorious reason for the defendant's request, the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial with the defendant unrepresented by counsel. If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel

14

without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel. If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance.

"In light of the fundamental rights implicated, Md. Rule 4-215(e) provides a 'precise rubric[ ]' with which we demand 'strict compliance.'" *State v. Graves*, 447 Md. 230, 241 (2016) (quoting *Pinkney v. State*, 427 Md. 77, 87 (2012)).

In *Dykes*, the Court of Appeals outlined the steps a court is required to take when the Rule 4-215(e) process is triggered:

(1) *The defendant explains the reason(s) for discharging counsel*[.] While the rule refers to an explanation by the defendant, the court may inquire of both the defendant and the current defense counsel as to their perceptions of the reasons and need for discharge of current defense counsel.

(2) *The court determines whether the reason(s) are meritorious*[.] The rule does not define "meritorious." This Court has equated the term with "good cause." This determination—whether there is "good cause" for discharge of counsel— is an indispensable part of subsection (e) and controls what happens in the third step.

(3) *The court advises the defendant and takes other action*[.] The court may then take certain actions, accompanied by appropriate advice to the defendant, depending on whether it found good cause for discharge of counsel—*i.e.,* a meritorious reason.

*Dykes*, 444 Md. at 652 (citations and quotation marks omitted).

In this case, the court afforded Mr. Cousins multiple opportunities to explain his reasons for discharging counsel, which were the same as those articulated in his brief. After Mr. Cousins's explanations, the court asked if he had "any other complaints [he] wish[ed] to register about [defense counsel's] misrepresentation of [him]." Later, the court asked if there was "anything else" to say about his motion to discharge counsel. In

15

addition, the court inquired of defense counsel as to his perception of Mr. Cousins's request for discharge. Based on what it heard, the court found that Mr. Cousins did not have good cause, and it advised him accordingly. Hence, the central question here is whether the court abused its discretion in finding that Mr. Cousins did not have good cause.

In evaluating the trial court's compliance with Rule 4-215(e), Maryland appellate courts generally apply a *de novo* standard of review. *Graves*, 447 Md. at 240. However, a trial court's determination that a defendant had no meritorious reason to discharge counsel under Rule 4-215(e) is reviewed for an abuse of discretion. *State v. Taylor*, 431 Md. 615, 630, 638, 642 (2013). To constitute an abuse of discretion, the decision "has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Evans v. State*, 396 Md. 256, 277 (2006) (citation and internal quotation marks omitted).

### B. **The Video**

The video that Mr. Cousins wanted to show consisted of almost two hours of irrelevant footage of Mr. Cousins passing time in a room after he had been interviewed by the police. Throughout the majority of the video, Mr. Cousins is either asleep or lying on the floor with a blanket on top of him. When given the opportunity to dispute that characterization, Mr. Cousins did not disagree.[6]

---

[6] The video brings to mind Andy Warhol's 1963 film *Sleep*, which consists of five hours of footage of a person sleeping.

16

Nonetheless, Mr. Cousins argues that this footage is relevant because it shows that he was either high or withdrawing from drugs, and thus is evidence that his police statement was not voluntary. We disagree.

Presenting the video to the motions court would have been senseless and an unproductive use of the court's time. The motions court had an ample opportunity to observe Mr. Cousins's demeanor during the interview itself, which included the *Miranda* warnings, and to rule accordingly on the voluntariness of his statements. The court did not abuse its discretion in finding no meritorious reason to discharge counsel because of the failure to attempt to introduce an additional two hours of video footage showing Mr. Cousins asleep or unconscious after the interview had ended.

## C. <u>Breakdown of Relationship With Counsel</u>

Mr. Cousins maintains that the court abused its discretion in ruling that the breakdown of his relationship with defense counsel, which included the subsequently dismissed grievance, was not a meritorious reason for discharging counsel. Taken together, we view the overall breakdown of the relationship between Mr. Cousins and defense counsel as Mr. Cousins's unilateral attempt to manipulate the proceedings against him. Therefore, the court did not abuse its discretion in ruling that this was not a meritorious reason to discharge counsel.

A complete breakdown in communication is considered "good cause" to discharge counsel. *Weathers v. State*, ___ Md. App. ___, 2016 WL 7017959, at *15 (Dec. 1, 2016) (Graeff, J., concurring) (citing *McKee v. Harris*, 649 F.2d 927, 931 (2d Cir. 1981)). In determining whether a court abused its discretion in denying a request to discharge

17

counsel because of a breakdown of communication, a relevant factor is "whether appellant and his or her 'counsel experienced a total lack of communication preventing an adequate defense.'" *Id.* at *15 (quoting *United States v. Reevey*, 364 F.3d 151, 156 (4th Cir. 2004) (internal quotation marks omitted)). It is also relevant to examine "'[w]hether the defendant substantially and unreasonably contributed to the communication breakdown.'" *Id.* (quoting *United States v. Lott*, 310 F.3d 1231, 1250 (10th Cir. 2002)). This Court views both of these factors as relevant in determining whether a court abused its discretion in finding that there was not good cause to discharge counsel because of a lack of communication. *See id.*

Mr. Cousins argues that the grievance compromised defense counsel's ability to represent him. In support of his argument, Mr. Cousins points to defense counsel's statement that the grievance prevented him from asking the court to re-open the suppression hearing and his equivocal statement that he would not be able to go forward at trial until the resolution of the grievance.

Assuming for the sake of argument that the grievance prevented counsel from asking to re-open the suppression hearing as counsel said, we still see no basis to conclude that the court abused its discretion in finding no meritorious reason to discharge counsel. The only fathomable reason for defense counsel to attempt to re-open the motions hearing was that Mr. Cousins vehemently adhered to the false impression that it would alter the motions court's ruling on the voluntariness of his statement. Mr. Cousins, as seen in the record, became unjustifiably fixated on this issue, to the point of engaging in an obscenity-filled rant. It is, however, beyond any serious dispute that the court

18

would not have changed its decision to deny the motion to suppress if it were required to review two hours of video-footage of Mr. Cousins lying asleep or unconscious on a floor. Indeed, given the undisputed characterization of what little the footage showed, it is highly doubtful that the court would have reviewed it at all before reiterating the denial of the motion to suppress.

The grievance presents a different question, because it does point out an area of adversity between Mr. Cousins and his counsel. Nonetheless, because the grievance was based on the meritless contention that counsel had somehow breached his professional obligations by not asking the motions judge to view the hours of footage of Mr. Cousins while he was asleep or unconscious, it is difficult to conceive how it would have interfered with counsel's ability to represent his client at trial. Although counsel objected to going forward while the grievance was still pending, he did not identify how the grievance would inhibit his ability to represent Mr. Cousins, other than to prevent him from making a vain request to re-open the suppression hearing. Nor was the alleged conflict sufficient to motivate counsel to move for leave to withdraw his appearance, even though the trial was to begin the next day. Meanwhile, counsel told the court that he was ready to try the case and "would like to take every opportunity to continue to represent Mr. Cousins." The court did not abuse its discretion in finding no meritorious reason to discharge counsel on the basis of a groundless grievance, subsequently dismissed, which had no material effect on counsel's ability to represent his client at trial. *See* 3 LaFave et al., *Criminal Procedure* § 11.4(b) (4th ed. 2007) ("a defendant cannot manufacture a conflict requiring disqualification of appointed counsel by simply filing a

disciplinary complaint against the attorney"); *State v. Bryant*, 285 Kan. 970, 993 (2008) (holding that court did not abuse discretion in denying defendant's motion to appoint new counsel where defendant claimed that current counsel had conflict of interest because he had filed disciplinary complaint against her).[7]

Mr. Cousins correctly observes that when a court "is confronted with the possibility of a conflict of interest," it "must take adequate steps to determine whether such a conflict exists." *Duvall v. State*, 399 Md. 210, 233 (2007). He complains that the court did not adequately investigate the nature of counsel's conflict in this case. We disagree, because we are satisfied from our review of the record that the court gave wide latitude to both Mr. Cousins and his attorney to discuss Mr. Cousins's complaints. In fact, the very purpose of the hearing was to investigate the bases, if any, for his complaints.

Although Mr. Cousins concedes that the trial court is not obligated to appoint a new attorney whenever an indigent defendant files a grievance against appointed counsel, he asserts that this matter should prove the exception. In support, Mr. Cousins cites *Taylor v. State*, 428 Md. 386 (2012). Mr. Cousins's reliance on *Taylor* is misplaced, because it is inapposite to the case at bar.

In *Taylor*, defense counsel sued the defendant for unpaid fees while representing him in a criminal trial. *Id.* at 411. The Court of Appeals stated that "[s]uch a conflict,

---

[7] *Cf. Koffley v. Koffley*, 160 Md. App. 633, 639 (2005) ("the fact that a litigant has made a complaint against the trial judge does not require that the trial judge grant the litigant's recusal motion," because "[t]o hold otherwise would vest every dissatisfied litigant with the power to recuse the trial judge").

20

where the *attorney-created* adversarial relationship adversely affects counsel's representation, infects the attorney-client relationship with an element of distrust, likely to affect the reliability of the trial and undermine confidence in the outcome." *Id.* at 410 (quotation marks omitted) (emphasis added). Here, by contrast, the attorney did not create an adversarial relationship. The putative conflict arose only because of the meritless claim put forth by Mr. Cousins, and it had no material effect on defense counsel's ability to present an adequate defense. The grievance was baseless, and the trial court clearly recognized it as such in its determination that Mr. Cousins had no meritorious reason to discharge counsel. Therefore, we too reject Mr. Cousins's contention that his attorney grievance complaint constituted a meritorious reason to discharge counsel.

In addition, we disagree with Mr. Cousins's assertion that the alleged breakdown of his relationship with defense counsel, with the grievance as one example, constituted a meritorious reason to discharge counsel. Although Mr. Cousins may have harbored acrimony towards defense counsel, this acrimony resulted principally from Mr. Cousins's unreasonable demands and did not rise to the level of "good cause" to warrant discharge of counsel. *Weathers*, ___, 2016 WL 7017959, at \*15 (Dec. 1, 2016) (Graeff, J., concurring) ("a defendant is not entitled to substitute counsel where he or she is the cause of the communication breakdown"); *accord United States v. DeTemple*, 162 F.3d 279, 289 (4th Cir. 1998) (a "court can properly refuse a request for substitution of counsel when the defendant's own behavior creates the problem"), *cert. denied*, 526 U.S. 1137 (1999).

Furthermore, "'[a]ttorney-client conflicts justify the grant of a substitution motion only when counsel and defendant are so at odds as to prevent presentation of an adequate defense.'" *Weathers*, 2016 WL 7017959, at \*15 n.7 (Graeff, J., concurring) (quoting *State v. Stenson*, 940 P.2d 1239, 1272 (Wash. 1997) (en banc), *cert. denied*, 523 U.S. 1008 (1998)). Yet, here, defense counsel said that he was ready to try the case and "would like to take every opportunity to continue to represent Mr. Cousins."

Of Mr. Cousins's complaints, the most that could be said is that he and his counsel disagreed about what to do with the lengthy portion of the recording that showed him while he was asleep or unconscious. A disagreement regarding legal strategy is not, however, a meritorious reason to discharge counsel. *See Bey v. State*, 228 Md. App. 521, 534 (2016) (holding that court did not abuse discretion in denying implied request to discharge counsel based on disagreement about whether to cross-examine victim); *see also United States v. Lott*, 310 F.3d 1231, 1249 (10th Cir. 2002) ("[g]ood cause for substitution of counsel consists of more than a mere strategic disagreement between a defendant and his attorney"); *United States v. Gibbs*, 190 F.3d 188, 207 n.10 (3d Cir. 1999) ("disagreement over legal strategy does not constitute good cause for substitution of counsel)*; People v. Linares*, 2 N.Y.3d 507, 511 (2004) ("good cause does not exist . . . where, on the eve of trial, disagreements over trial strategy generate discord").

Throughout the course of these proceedings, Mr. Cousins showed an inability to conduct himself in an appropriate manner. He relentlessly attacked defense counsel, the prosecutor, and the trial judge, employing vulgar language and profanity. Mr. Cousins had difficulty communicating with anyone throughout these proceedings. Given Mr.

Cousins's inability or unwillingness to communicate in an appropriate, civil manner, it is very likely that his communication problems would have persisted even if the court had granted a postponement and appointed substitute counsel.

The predicament in which Mr. Cousins placed the trial court is not unique to this case. Rule 4-215(e) cases present dilemmas for trial courts, and trial courts must exercise their considered discretion in navigating this "ugly patch of difficult terrain." *See Garner v. State*, 183 Md. App. 122, 127 (2008), *aff'd*, 414 Md. 372 (2010). In its evaluation of such a demand, a trial court may choose to credit or discredit the arguments presented, and after doing so, must use its own judgment in making a ruling. Almost 30 years ago, Judge Eldridge outlined the conundrum courts have long faced in these instances:

> The interplay among the right to counsel, waiver of the right to counsel, and the *Faretta* [*v. California*, 422 U.S. 806 (1975)] right of self-representation, has posed problems when, shortly before or at the beginning of trial, a defendant makes an unmeritorious demand for the discharge of current counsel and for the appointment or retention of different counsel, and where, as is usually the situation, the appointment or retention of new counsel would require a trial postponement. If the trial judge properly refuses to grant such demand, a defendant will often attempt to delay the proceedings by refusing either to proceed with current counsel or to make an affirmative election of his *Faretta* right of self-representation. In such circumstances, where a postponement would be improper, the trial judge is faced with the dilemma of forcing the defendant to trial without an attorney or forcing the defendant to proceed with an unwanted attorney.

*Fowlkes*, 311 Md. at 589.

Here, Mr. Cousins made a demand for the discharge of defense counsel on the eve of trial. After permitting Mr. Cousins and defense counsel to speak on the issue, the trial court found the request to be unmeritorious. The trial court was under no obligation to accede to Mr. Cousins's request and to credit his complaints. Instead, in holding that the

23

demand was unmeritorious, the trial court properly exercised its discretion in determining what to accept as true, and what to discount as false. *See id.* at 607. The record fully supports the trial court's conclusion.

If the court had appointed different counsel, it undoubtedly would have been forced to postpone a trial that was set to take place the following day. A postponement would have been disruptive, as both parties were ready to proceed with trial but for Mr. Cousins's request to discharge counsel. Furthermore, a postponement would have rewarded Mr. Cousins for his unacceptable conduct, for his unjustified contentions, and for fabricating a conflict by filing a groundless grievance. Therefore, we cannot fault the trial court for ruling that Mr. Cousins did not have a meritorious reason to discharge counsel.

After the ruling, Mr. Cousins both refused to proceed with defense counsel and elected to exercise his right of self-representation. His actions placed the trial court in a predicament, as the court had no choice but to force an unrepresented defendant to stand trial or force him to stand trial with an attorney he did not desire. The trial court attempted to dissuade Mr. Cousins from dismissing defense counsel on multiple occasions and warned him of the consequences of doing so. Mr. Cousins, steadfast in his desire to proceed without an attorney, said "Yes, I'd rather have nobody than to have somebody who ain't for me and I'd rather be tried." On another occasion, he affirmed that he had "waived [his] right to counsel." On yet another occasion, he told the court that he was "ready to go to trial without" an attorney.

In summary, we hold that the trial court did not abuse its discretion in ruling that Mr. Cousins lacked a meritorious reason to discharge counsel.

## III.  Mr. Cousins's Removal From the Courtroom

Mr. Cousins stood trial on February 2, 2016, the day after he had discharged his appointed counsel.  Mr. Cousins was to represent himself.

Before jury selection, Mr. Cousins made it clear that he would disrupt the court during the trial:

> [COURT]: [W]e're going to make you a copy of the charge papers.

> [MR. COUSINS]: . . . You talking about starting a trial, I don't even have enough, ample time to read what's happening with this charge of September 13th.

> [COURT]: All right.  Mr. Cousins --

> [MR. COUSINS]: That's some bullshit, man.

> [COURT]: I was, I thought I was pretty clear about the fact that --

> [MR. COUSINS]: I thought I was pretty clear too.  I was getting a fair trial.

> [COURT]: You're going to get a trial --

> [MR. COUSINS]: And I'm going to keep on talking, I'm going to keep saying what, I'm going to disrupt your Court until you do what you supposed to do and until then, we (inaudible) communicate.

> [COURT]: You're going to disrupt my Court until what?

> [MR. COUSINS]: I'm going to continue to interrupt your Court until we do what we supposed to do.  You're going to give me everything that I'm entitled to.  You're going to give me a chance to read my stuff.  You're not going to just take me to trial today.  What kind of shit is that?

[COURT]: Okay.  Is there anything else you want to say at this point?

[MR. COUSINS]: Yeah, fuck you.

[COURT]: Oops.  All right.  So Mr. Cousins, the Court has the authority to remove you from these Court proceedings which I intend to exercise in such a moment.

[MR. COUSINS]: (inaudible) exercise.

[COURT]: Hold on just a second, guys.  I want to try and get a few words in edgewise before I remove Mr. Cousins from this proceeding.

[MR. COUSINS]: Fuck you, that's right, fuck you.

[COURT]: The, I am going to seek, unless you promise to behave yourself --

[MR. COUSINS]: I'm going to promise you this, kiss my black ass where the sun don't shine.  I'm going to promise you that.

[COURT]: Okay.  I am going to –

[MR. COUSINS]: I promise you I'm going to see you in hell too. With Hinkle[8] and the rest of you redneck motherfuckers.

The court noted its authority under *Biglari v. State*, 156 Md. App. 657 (2004), to remove a disruptive defendant from the courtroom and indicated that it intended to exercise that authority.  The court explained that in its view Mr. Cousins would continue to interrupt the proceedings, as he had promised.  Mr. Cousins indeed continued with his disruptive behavior, and eventually countered with a statement that, "That's why they got a Courts of Appeal [sic] for you, asshole.  Come on, let's go away.  Fuck, yeah.  Have a

---

[8] Mr. Cousins appears to have been referring to the late J. William Hinkel, who was formerly a judge on the Circuit Court for Baltimore County.  We presume that Judge Hinkel presided over an earlier criminal prosecution against Mr. Cousins.

nice day." The court had Mr. Cousins removed from the courtroom after it explained how the trial would proceed. The court also explained that should Mr. Cousins wish to return to the courtroom and conduct himself appropriately, all he needed to do was to inform a deputy.

Mr. Cousins was placed in a holding cell outside of the courtroom for the remainder of the one-day trial. The court assigned a deputy to sit with Mr. Cousins so that he could notify the court if he wished to rejoin the proceedings. At various phases of the trial, the court, via the deputy, asked Mr. Cousins whether he wanted to return to the courtroom. Mr. Cousins declined each time. Mr. Cousins contends that the court erred when it removed him from the courtroom during his trial and failed to provide him with any means to monitor the proceedings.

A defendant has the right to be present at every stage of his or her trial. *Biglari*, 156 Md. App. at 670; *see also* Md. Rule 4-231. However, "[t]he right to be present is waived by a defendant 'who engages in conduct that justifies exclusion from the courtroom.'" *Biglari*, 156 Md. App. at 671 (quoting Md. Rule 4-321(c)(1)-(2)). When faced with a disruptive defendant, a trial judge can "(1) bind and gag him, thereby keeping him present; (2) cite him for contempt; [or] (3) take him out of the courtroom until he promises to conduct himself properly." *Illinois v. Allen*, 397 U.S. 337, 344 (1970). "When the trial court selects the third option, however, the defendant who is removed from the courtroom must be advised of the opportunity to return upon a promise to behave." *Biglari*, 156 Md. App. at 671.

27

We hold that the court's decision to exclude Mr. Cousins from the courtroom was reasonable. Mr. Cousins concedes that he "initially waived his right to be present." Mr. Cousins "did not simply speak out of turn or make the occasional outburst." *Shiflett v. State*, 229 Md. App. 645, 671 (2016). He consistently used vulgar, insulting, inappropriate, and angry language with the court and the prosecutor. Mr. Cousins promised the court that he would engage in disruptive behavior to prevent the trial from proceeding, and he fulfilled that promise while he was in the courtroom. His conduct left the court with little choice but to remove him.

Mr. Cousins, however, argues that the court erred when it did not afford him the opportunity to observe the proceedings after his removal. Citing *Biglari*, Mr. Cousins contends that the court should have given him a video or audio feed of the proceedings so that he could remain apprised of what was happening. He asserts that the court's failure to do so obstructed his constitutional right to present a defense and to confront and cross-examine witnesses. Mr. Cousins maintains that even if he chose to return to the proceedings, his exercise of this right would essentially have been futile because he could not see or hear the evidence presented in his absence. We disagree with his interpretation of *Biglari* and hold that his position is without merit.

In *Biglari*, the court removed Biglari from the courtroom after his repeated interruptions and his refusal to comply with the court's instructions. *Biglari*, 156 Md. App. at 664. Biglari was escorted to the judge's office, where he observed the proceedings on a closed-circuit TV set. *Id.* at 663-64.

28

Mr. Cousins maintains that "[t]rials are invariably video or audio recorded," and he asserts that, "[p]ractically speaking, providing a video or audio feed of a trial to an absent defendant is hardly an onerous requirement." We reject his contention because we are unwilling to assume that all courtrooms in Maryland have the capacity to support a live feed to an outside location.

Mr. Cousins reads *Biglari* to mandate that defendants be provided a means to watch or listen to the proceedings when a court removes them from the courtroom because of their misconduct. *Biglari* contains no such mandate. Although the circuit court provided Biglari with a TV to view the proceedings, this Court did not hold that the court was required to do what it did.

*Biglari* requires only that a trial court give a defendant the opportunity to return upon a promise to behave appropriately. *Biglari*, 156 Md. App. at 674 ("[e]rror occurred, however, when appellant was not afforded the opportunity to return to the courtroom upon a promise to behave properly"). In this case, the trial court made it abundantly clear to Mr. Cousins how he could, if he chose, exercise his right to re-enter the trial:

> I'm going to place a deputy in the cell with you at all times. If you decide that you have changed your mind and wish to attend your own trial, all you need to do is tell that deputy that you have changed your mind and wish to come out here and participate in the process. You will have a seat at the trial table, just like any other litigant, you can listen to the evidence. As I told you before, you can make an opening statement, you can cross examine witnesses, you can abide by the same terms and conditions that every other person abides by when they walk through the backdoors of a courtroom in this County or any other jurisdiction in this State or in the United States of America. We want you to participate in your trial.

The deputy with Mr. Cousins had an earpiece so that he could quickly communicate with the trial judge if Mr. Cousins elected to rejoin the proceedings. Before the court recessed for lunch, it observed that Mr. Cousins had not asked to return to the courtroom. The record indicates that a representative of the court inquired with the deputy in Mr. Cousins's cell every five or ten minutes to confirm that he had not asked to return to the courtroom.

After the recess, the court again ensured that Mr. Cousins had not asked to return to the proceedings. In an abundance of caution, the court requested that the deputy ask Mr. Cousins if he wanted to re-enter the courtroom. According to the court, Mr. Cousins indicated that he did not wish to come back in the courtroom because he would be disruptive.

Later, the court summoned Mr. Cousins to inform him that the State had rested its case. The court asked Mr. Cousins if he wished to participate in the trial, and Mr. Cousins declined. The court again told Mr. Cousins that if he changed his mind, all he needed to do was to inform the deputy. Lastly, the court requested that the deputy ask Mr. Cousins if he wished to observe the jury verdict. Once again, Mr. Cousins declined.

In compliance with *Biglari*, the court afforded Mr. Cousins multiple opportunities to return to the courtroom if he promised to behave properly. Mr. Cousins refused to conform his conduct to the court's reasonable expectations, and those of civil society. The court did not err in its decision to remove Mr. Cousins from the courtroom, in the procedure that it used to effectuate the removal, or in the manner in which it safeguarded Mr. Cousins's right to re-enter the trial upon a promise to behave appropriately.

30

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**