**Wallace v. State, No. 53 of the 2017 Term, Opinion by Moylan J.**

**HEADNOTE:**

SECOND-DEGREE MURDER – THE ATTACHMENT OF THE SIXTH AMENDMENT RIGHT TO COUNSEL – AN INVESTIGATIVE PROCEDURE VERSUS A PROSECUTORIAL COMMITMENT – THE DISTINCTION BETWEEN BEING AN "ACCUSED" AND BEING AT A "CRITICAL STAGE" – A CONTRACTUAL RIGHT TO COUNSEL IS NOT A CONSTITUTIONAL RIGHT TO COUNSEL – NO MERITORIOUS REASON FOR DISCHARGING COUNSEL – NON-PRESERVATION: NOTHING MORE NEED BE SAID – OUR CONCERN IS NOT ONLY WITH "WHAT DID THE APPELLANT SAY?" BUT WITH "WHEN DID HE SAY IT?" – THE ESSENTIAL PLURALISM OF CRIMINAL HOMICIDE – THE APPELLANT REQUESTS THAT WE NOTICE PLAIN ERROR – CORRECTING A CLERICAL GLITCH

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 53

September Term, 2017

_____

DAVON WALLACE

v.

STATE OF MARYLAND

_____

Friedman,
Beachley,
Moylan, Charles E., Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: June 4, 2018

Precisely when (and why) the Sixth Amendment right to counsel attaches to a person is a far more nuanced inquiry than would at first blush appear likely. This appeal presents us with a profusion of such nuances. The appellant, Davon Wallace, was convicted by a jury, presided over by Judge Lawrence V. Hill, Jr., of second-degree depraved heart murder and two related firearm counts. On this appeal, he contends:

1.  The lower court erred by denying the motion to suppress an incriminating statement.

2.  The lower court erred by ruling that Mr. Wallace had no meritorious reason for discharging counsel.

3.  The State failed to present sufficient evidence to sustain the conviction for second degree murder.

4.  The lower court erred by allowing the jury to consider the charge of second degree felony murder.

5.  The commitment record improperly reflects that Mr. Wallace was convicted of first degree murder, a crime of which Mr. Wallace was acquitted.

### The Attachment Of The Sixth Amendment Right To Counsel

The killing of three-year-old Knijah Bibb, which the appellant does not contest, took place on August 10, 2014. On that day, the appellant immediately arranged for John McKenna, Esq. to represent him as his privately retained defense counsel. Mr. McKenna informed Prince George's County prosecutors that the appellant would turn himself in on August 12, 2014. On that date, however, the appellant failed to appear. A manhunt ensued. The appellant was located in the District of Columbia on September 16, 2014. He was transported to the Metropolitan Police Department and was there interrogated by detectives

from Prince George's County. The appellant, on a taped audio/video recording, provided information linking him to the shooting of Knijah Bibb.

The appellant's first contention is that because that police interview was conducted without the appellant's attorney having been present, it violated his Sixth Amendment right to counsel and should, therefore, have been suppressed. We are going to respond to the contention expressly in the terms in which the appellant has framed it. There is no challenge to the statement based on common law voluntariness. There is no challenge to the statement based on Miranda v. Arizona or on the Fifth Amendment privilege against self-incrimination. There is no challenge pursuant to Maryland constitutional law. This contention is based exclusively on the Sixth Amendment and on nothing else.

Under those circumstances, it is 'passing strange that nowhere in the appellant's brief are we told that he was indicted by the Grand Jury for Prince George's County on November 18, 2014. That, of course, was the red letter day on which the appellant was graduated from the ranks of the hoi polloi of ordinary personhood and assumed the honorific title of "the accused" for special Sixth Amendment status.[1] An indictment per se,

---

[1] The surest way to understand the Bill of Rights is to read what the words of the Bill of Rights actually say. The Fifth Amendment, for instance, is a long compound sentence embracing no fewer than five constitutional rights. At the top of the sentence, however, is a single word that is the subject of the entire sentence—"person." One becomes a person no later than the moment of one's birth. One remains a person until the moment of one's death. As long as one is a card-carrying member of homo sapiens, one enjoys the entire package of Fifth Amendment constitutional rights.

(continued . . . )

2

of course, might not have been indispensable for such status. It could, alternatively, have

been conferred by the filing of a criminal information by the State's Attorney, but it was

not. This Court went to great lengths to explain this Sixth Amendment investiture

ceremony in In re Darryl P., 211 Md. App. 112, 176–77, 63 A.3d 1142 (2013):

> The initial attachment of the right in this case is uncontroversial. The very wording of the Sixth Amendment, of course, restricts its application to "criminal proceedings." Even with respect to criminal proceedings, moreover, the entire package of Sixth Amendment rights is only available to "the accused." That is in dramatic contrast to the Fifth Amendment, which is broadly available to "persons" generally. What is it then that raises one's status from the hoi polloi of mere "persons" to the special station of being "the accused"? The standard statement for acquisition of "accused" status is United States v. Gouveia, 467 U.S. 180, 187, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984):

>> [A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him.

> In further explanation of how "adversary judicial proceedings have been initiated," the Court elaborated that such initiation occurs "by way of formal charge, preliminary hearing, indictment, information, or arraignment." 467 U.S. at 188, 104 S. Ct. 2292. As Moran v. Burbine, 475 U.S. 412, 430, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), emphatically points out, the fact that one has privately retained a lawyer does not trigger the Sixth Amendment right to counsel. Only the honorific of "accused" can do that.

( . . . continued)

The Sixth Amendment, by contrast, is an even longer sentence, embracing seven separate constitutional rights. At the top of the sentence is the subject of the entire Amendment right. One must qualify for the honorific "accused" by a meticulously prescribed rite of passage.

The best insight into the Sixth Amendment is gleaned by contrasting it with the Fifth Amendment. A Sixth Amendment right has a much shorter shelf life than has a Fifth Amendment right. The Fifth Amendment is a package of life-long rights. The Sixth Amendment is a package of trial rights. One only acquires a trial right when one is destined to stand trial.

3

(Emphasis supplied).

## An Investigative Procedure Versus A Prosecutorial Commitment

The rite of passage by which the State commits itself to a criminal trial of "the accused," moreover, is not an investigative step or function but a formal prosecutorial commitment. On August 10, 2014, to be sure, the police filed a Statement of Charges with a District Court Commissioner, charging the appellant with murder and asking for an arrest warrant. The Commissioner signed the Statement of Charges and issued the arrest warrant. That, however, was a preliminary investigative function and not a formal commitment to prosecution. The appellant was not yet in custody and would not be in custody for more than another month. A formal commitment to prosecute can only be made 1) by the Grand Jury, by filing an indictment; 2) by the State's Attorney, by filing a criminal information; or 3) in rarer cases, by the filing of the ultimate pleading, the official document on which a defendant could be tried in a lower court proceeding.

As the Supreme Court explained in Kirby v. Illinois, 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972), "it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified." See also United States v. Gouveia, 467 U.S. 180, 187, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984). Citing Kirby, the Court of Appeals in State v. Gee, 298 Md. 565, 574, 471 A.2d 712 (1984), spoke to the same effect.

> [W]hen the defendant cannot be tried under the warrant-statement of charges he is not held to answer a criminal charge on the basis of that document. Its issuance does not mark the onset of formal prosecutorial proceedings to which the Sixth Amendment guarantee is applicable, nor has the putative defendant thereby become an "accused."

4

(Emphasis supplied).

In <u>Webster v. State</u>, 299 Md. 581, 474 A.2d 1305 (1984), the Court of Appeals held that a defendant was not yet an "accused" and, therefore, did not possess a Sixth Amendment right to counsel at a police line-up, notwithstanding the fact that a "Statement of Charges and the arrest warrant were issued prior to the lineup." The Court of Appeals held that neither qualified as a "formal charge."

> The Statement of Charges charged Webster with first degree rape. That felony is within the exclusive jurisdiction of the circuit court, and, therefore, <u>the Statement of Charges did not constitute a charging document under which a defendant may be tried.</u>

299 Md. at 611 (emphasis supplied). In the present case, the words of <u>State v. Gee</u>, 298 Md. at 574, are dispositive:

> The State has not by the issuance of such a warrant-statement of charges committed itself to prosecute. Before it can proceed <u>the grand jury must indict or the State's Attorney must file an information.</u> Neither is obliged to do so.

(Emphasis supplied).

The appellant thus did not become an "accused" on August 10, 2014. He did not become an "accused" until he was indicted on November 18, 2014.

### The Distinction Between Being An "Accused" And Being At A "Critical Stage"

The appellant here is nonetheless obsessed with the issue of whether the police's taking of a statement from him on September 26, 2014, was a "critical stage." It may have been, but that alone, to the appellant's chagrin, would not confer on him a Sixth Amendment right to counsel. In focusing as he does, the appellant is looking only at the

5

second step of a two-step attachment process. He completely ignores the indispensable and antecedent first step. Even an "accused" does not enjoy the cloak of the Sixth Amendment at every stage of his post-indictment life. He must be ensnared in a "critical stage" of the prosecution for his Sixth Amendment right to counsel to click in. Being "accused" is not enough. You must be an "accused" who is also at a "critical stage."

Conversely, being at a "critical stage" is not enough, unless you also qualify as "the accused." Those who do not yet qualify for Sixth Amendment coverage do not acquire such coverage simply by being at a "critical stage." The Supreme Court created this difference but we explained the difference in Wood v. State, 196 Md. App. 146, 157–58, 7 A.3d 1115 (2010), cert. denied, 418 Md. 192, 13 A.3d 800 (2011):

> Kirby v. Illinois, 406 U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972), first held that a suspect placed in a pre-indictment, as opposed to a post-indictment, line-up did not yet enjoy the protection of the Sixth Amendment because such a suspect was not yet an "accused." Being at a critical stage would qualify an "accused" for Sixth Amendment assistance, but if you are not yet "accused" even a critical stage would not help. Whatever little wind still propelled the exclusionary sails after Kirby, it was largely wafted away by the subsequent holding in United States v. Ash, 413 U.S. 300, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973), that even a post-indictment exhibition of a photograph of a subject, either in a group picture or as part of an array of individual photographs, was, unlike standing the suspect in a live line-up, not a critical stage. Whereas Kirby had diminished the ranks of the "accused," Ash diminished the incidence of a "critical stage."

(Emphasis supplied). It is a case of 1) eligibility plus 2) need. Neither one alone will suffice.

### A Contractual Right To Counsel
### Is Not A Constitutional Right to Counsel

The appellant persists that the police violated his Sixth Amendment right to counsel when they interrogated him on September 26, 2014, without his retained counsel's having

been present. The flaw in the appellant's argument is that the police could not have violated his Sixth Amendment right to counsel on September 26, 2014, because the appellant had no Sixth Amendment right to counsel on that date. He would not acquire such a right until seven and one-half weeks later, when he was indicted by the Prince George's County Grand Jury. It was only on November 18, 2014, that formal prosecutorial proceedings were launched against him and that he thereby became an "accused" person. It was only then that he enjoyed a Sixth Amendment right to counsel.

The appellant seems to harbor an idea that his retention of John McKenna, Esq., on August 10, 2014, endowed him with a Sixth Amendment right. In his brief, he argues:

> At the suppression hearing, attorney <u>John McKenna testified that he had agreed</u>, on August 10 or 11, 2014, <u>to represent Mr. Wallace in this case.</u> Mr. McKenna reached out to the prosecutors to arrange for Mr. Wallace to turn himself in on August 12, 2014. Mr. Wallace did not appear. <u>Mr. McKenna testified that he still considered himself Mr. Wallace's attorney when Mr. Wallace was arrested and interrogated in Washington, D.C., about a month later. Detective Deere</u>, who was among the three officers who interrogated Mr. Wallace, <u>testified that he knew that Mr. Wallace had a lawyer at that time.</u>
>
> At several points in the interrogation, <u>Mr. Wallace indicated that he wanted his attorney present while talking to investigators.</u> When a detective began to tell Mr. Wallace about his <u>Miranda</u> rights, Mr. Wallace said, "I already know these things. Y'all know I got a lawyer too, right[?]" The detective responded, "Yeah. No, we know that." <u>Rather than contact Mr. Wallace's attorney, the detectives continued with the interrogation,</u> pressing Mr. Wallace to share "[his] version of what happened." Mr. Wallace responded, "I already told my version," to "[m]y lawyer."

(Emphasis supplied).

A contractual right to counsel, however, is not a constitutional right to counsel. As In re Darryl P., 211 Md. App. at 176–77, explained:

7

As <u>Moran v. Burbine</u>, 475 U.S. 412, 430, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), emphatically points out, <u>the fact that one has privately retained a lawyer does not trigger the Sixth Amendment right to counsel.</u> Only the honorific of "accused" can do that.

(Emphasis supplied).

In <u>Moran v. Burbine</u>, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), the family of the defendant had already retained counsel to defend him at the time the police arrested him and subjected him to a police interrogation. Justice O'Connor's opinion for the Court explained why the private retention of counsel was not tantamount to the attachment of the Sixth Amendment right to counsel.

More importantly, <u>the suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel. The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake</u> any more than it is to protect a suspect from the consequences of his own candor. Its purpose, rather, is to assure that in any "criminal prosecutio[n]," U.S. Const., Amdt. 6, the accused shall not be left to his own devices in facing the "'prosecutorial forces of organized society.'" By its very terms, <u>it becomes applicable only when the government's role shifts from investigation to accusation.</u>

475 U.S. at 430 (emphasis supplied; some internal citations omitted).

For this distinction between a contractual right to counsel and a constitutional right to counsel, the absolute clincher is <u>Maine v. Moulton</u>, 474 U.S. 159, 168–76, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985). In that case, a surreptitious investigation of the defendant had produced evidence against him with respect to two separate crimes, for one of which he had already been indicted and for the other of which he had not. For the crime for which Moulton had already been indicted, the violation of his Sixth Amendment right to counsel meant that his inculpatory words obtained thereby would be excluded from being used

8

against him at the trial for that particular crime. For the trial of the crime for which he had not been indicted, by contrast, there was no violation of a non-existent Sixth Amendment right to counsel, and therefore, no exclusion of the inculpatory evidence was warranted. The Supreme Court's opinion in <u>Moran v. Burbine</u>, 475 U.S. at 431, explained fully the Court's reasoning in <u>Maine v. Moulton</u>:

> There, we considered the constitutional implications of <u>a surreptitious investigation that yielded evidence pertaining to two crimes. For one, the defendant had been indicted; for the other, he had not.</u> Concerning the former, the Court reaffirmed that after the first charging proceeding the government may not deliberately elicit incriminating statements from an accused out of the presence of counsel. <u>The Court made clear</u>, however, <u>that the evidence concerning the crime for which the defendant had not been indicted</u>—evidence obtained in precisely the same manner from the identical suspect—<u>would be admissible at a trial limited to those charges.</u> The clear implication of the holding, and one that confirms the teaching of <u>Gouveia</u>, is that <u>the Sixth Amendment right to counsel does not attach until after the initiation of formal charges.</u> Moreover, because Moulton already had legal representation, <u>the decision all but forecloses respondent's argument that the attorney-client relationship itself triggers the Sixth Amendment right.</u>

(Emphasis supplied; internal citations omitted).

In this case, there was no violation of the appellant's Sixth Amendment constitutional right because the right allegedly violated did not exist.

## No Meritorious Reason For Discharging Counsel

In his second contention, the appellant claims that Judge Hill "erred by ruling that [the appellant] had no meritorious reason for discharging counsel." On the first day of trial, November 14, 2016, defense counsel, before the trial formally began, alerted Judge Hill that the appellant "has indicated that he is unsatisfied with me and he would like to remove

me as counsel."[2] Accordingly, Judge Hill conducted a hearing pursuant to Maryland Rule of Procedure 4–215(e), in which he explored the issue thoroughly with the appellant and with his appointed defense counsel. Rule 4–215(e) provides:

> (e) **Discharge of Counsel—Waiver.** <u>If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request.</u> If the court finds that there is a meritorious reason for the defendant's request, the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial with the defendant unrepresented by counsel. <u>If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel.</u> If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)–(4) of this Rule if the docket or file does not reflect prior compliance.

(Emphasis supplied).

Pursuant to the Rule, Judge Hill did not simply permit the appellant to explain the reasons for his request, but generously indulged him in doing so. <u>State v. Graves</u>, 447 Md. 230, 242, 135 A.3d 376 (2016). Under the circumstances of this case, the only issue for Judge Hill to decide was that of whether there was or was not "a meritorious reason" for the appellant to discharge his attorney. With respect to the core ruling itself, "meritorious" means with "good cause." <u>Dykes v. State</u>, 444 Md. 642, 652, 121 A.3d 113 (2015). Judge Hill ruled that there was no meritorious reason to justify the discharge of

---

[2] In the intervening two years, the appellant's retainer of John McKenna, Esq. had long since lapsed. The appellant, at trial, was represented by the Office of the Public Defender.

counsel. Having made that ruling, it became incumbent on Judge Hill to explain to the appellant that the trial would proceed as scheduled without further delay. Thus warned, the appellant opted to allow his appointed counsel to continue to represent him, and the matter was closed.

In terms of the appellate standard by which the Court will review such a ruling, Cousins v. State, 231 Md. App. 417, 438, 153 A.3d 163, cert. denied, 453 Md. 13, 160 A.2d 549 (2017), made it clear that "a trial court's determination that a defendant had no meritorious reason to discharge counsel under Rule 4–215(e) is reviewed for an abuse of discretion." See also State v. Taylor, 431 Md. 615, 630, 66 A.3d 698 (2013). By way of further insight into how deferential to the trial court's ruling the abuse-of-discretion standard actually is, Evans v. State, 396 Md. 256, 277, 914 A.2d 25 (2006), explained that to constitute an abuse of discretion, the trial judge's decision "has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." (Internal quotation marks and citation omitted).

Were the appellant's reasons for wishing to discharge his lawyer before this Court for a de novo ruling, we would not find those reasons to be meritorious. A fortiori, we cannot hold that Judge Hill abused his discretion in so ruling. In the words of Evans v. State, his ruling was not "beyond the fringe of what [this] [C]ourt deems minimally acceptable."

A few representative snippets of appellant's argument before Judge Hill will suffice to reveal the essential insubstantiality of his argument. When on the morning of the scheduled trial, November 14, 2016, the appellant asked permission to discharge his

11

lawyer, the appellant had been represented by that lawyer for essentially two years. The appellant's complaints about the infrequency of their communications were not new. As Judge Hill probed insistently for some explanation as to why the appellant had waited until the morning of the trial to bring his complaint before the court, the appellant could offer no cogent explanation.

> THE COURT: What I'm saying is his appearance has been in the case since November of 2014, October, November, 2014, almost two years to the date. He has been representing you for two years. During the course of that time there have been several trial dates.
>
> Why are you waiting until two years later, why are you waiting until your third or fourth trial date before you are asking that he not represent you?
>
> THE DEFENDANT: They have been continued, and me and my family we were working on getting me a lawyer, and things of that nature. We were working on getting me a private attorney, and things of that nature. Plus it is like I can't get in contact with him to, you know, to tell him how I feel. Friday he came to see me and I told him Friday, but he said I would have to see you and here I am.
>
> THE COURT: But you are not really answering my question. My question, again, is he has been representing you for two years, 24 months.
>
> THE DEFENDANT: Right.
>
> THE COURT: Why are you waiting until the 24th month to want to fire him, essentially? Why didn't you fire him after six months? Eight months? 12 months? Why are you waiting until, again, your third or fourth scheduled trial date?

The appellant's primary reason for not having brought the matter to the attention of the court seemed to have been wrapped up in his unrealistic hopes of obtaining a private attorney.

> THE DEFENDANT: I really didn't think I would have him this long. I thought I would have my private attorney by now.

12

THE COURT:  You have had two years to hire a private attorney and you haven't.

THE DEFENDANT:  I have been working on it, too. I also have been working on it.

THE COURT:  Do you have a private attorney?

THE DEFENDANT: No.

After the appellant made one or two substantive complaints, Judge Hill called upon defense counsel to explain the nature of his trial preparation. Counsel provided full detail.

We did go over the content, we spoke about them, we spoke about all the witnesses prior to the last trial date. The last trial date we were ready to go mostly. We had discussed everything, our trial strategy and everything else leading up to the last trial date. The week before that is when he asked to look into character witnesses. That is why the last trial date was continued was to try to find character witnesses. That would have been the only difference in our trial strategy from the last trial date to this trial date would have been if we found character witnesses, and it would have possibly change some of our strategy some.

Since that time the social worker in our office had gone over and spoken to Mr. Wallace about that. They looked into finding character witnesses. I spoke to his family and asked them to give me names of character witnesses. In the end we only found one name. The social worker was able to speak to her. Unfortunately, I was not.

I saw [Mr. Wallace] again last week, explained the trial strategy is essentially the same because we don't have any character witnesses. All the stuff we talked about pretrial last time, nothing has changed. That is why I did not go back over to rehash everything that we had already spoken about because the trial strategy, everything we spoke about, nothing has changed since the last trial date.

In regards to the phone records. He did mention to me that he wanted the phone records. I disagreed in the strategy reasons. We looked at it. We looked at the discovery. I explained to him why I did not think the phone records, and specifically speaking of phone records for one of the witnesses, why I believed that those phone records would not help us and possibly could hurt us. That is why I did not seek them. I explained that to him.

13

(Emphasis supplied).

Judge Hill gave his reasons for finding that the appellant's reasons for wishing to discharge counsel were non-meritorious.

> All right, sir, <u>I have considered your request.</u> Again, <u>the indictment goes back two years. There have been numerous trial dates.</u> I believe at least two of the continuances were the State's request. Nevertheless, <u>this case has been set for trial numerous times. You are just now making your request for a continuance.</u>
>
> You gave me a reason for [defense counsel's] not giving you his all, as well as questions about the discovery. <u>I have heard [defense counsel's] response. I believe he has represented you to the best of his ability and has made some trial decisions, legal decisions that you may not agree with, but he is</u> an attorney, <u>an experienced attorney</u>, an experienced attorney <u>doing homicide cases</u> as well. <u>I don't find that there are meritorious reasons to discharge [defense counsel]</u>.

(Emphasis supplied).

In making that ruling, Judge Hill did not abuse his discretion. His ruling was not "beyond the fringe of what [this] [C]ourt deems minimally acceptable."

## Non-Preservation: Nothing More Need Be Said

The appellant's third contention could have generated some tantalizing legal issues, had it been preserved for appellate review. Unfortunately, it has not been preserved. Maryland Rule of Procedure 4–324(a) is firm as it provides in pertinent part:

> (a) **Generally.** A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. <u>The defendant shall state with particularity all reasons why the motion should be granted.</u>

(Emphasis supplied).

14

A generic motion for acquittal will not suffice. A defendant must "state with particularity" his reasoning as to why his motion should be granted. On this issue, the Court of Appeals has been adamant, holding in State v. Lyles, 308 Md. 129, 135, 517 A.2d 761 (1986):

> The language of the rule is mandatory. Hence Lyles was required to state with particularity all reasons why his motion for judgment of acquittal should be granted. The record is clear; he did not do so on either occasion he made such motion.

(Emphasis supplied). The sanction for the failure to "state with particularity" is clear.

> Accordingly, no grounds for the motion having been given, the issue of the sufficiency of the evidence has not been preserved.

308 Md. at 136 (emphasis supplied).

## Our Concern Is Not Only With "What Did The Appellant Say?" But With "When Did He Say It?"

In the case now before us, the appellant made the following curious motion for a judgment of acquittal at the end of the State's case.

> [DEFENSE COUNSEL]: Thank you. The defense does make a motion for judgment of acquittal. We had large arguments over the jury instruction earlier in regards to what instructions could or could not be read.
>
> Specifically a large instruction with regard to the second-degree felony murder charge. In regards to that charge we would adopt and incorporate all of those arguments into our motion for judgment of acquittal.
>
> In regards to all other counts, we would submit on the evidence.

(Emphasis supplied). The motion was denied. At the end of the entire case, the appellant renewed his motion and simply submitted "on prior argument." That motion was denied as well.

Contained therein is a curious little procedural wrinkle, well worthy of brief comment. Will an argument about the continuing vitality of second-degree felony murder made in the course of a lengthy discussion about jury instructions serve as an adequate challenge to the legal sufficiency of the State's evidence to prove second-degree murder made at the end of the entire case? We do not hesitate to hold that Rule 4–324(a)'s command to "state with particularity" means to "state with particularity" **HERE AND NOW**.

To attempt to incorporate by unadorned reference something that was said in another place at another time and in another context is not to "state with particularity" why a judgment of acquittal should be granted. The "large argument over the jury instruction" to which the appellant refers spanned almost 50 pages in the transcript.[3] One might as readily move for a judgment of acquittal on the basis of "all of the arguments that have been made in the course of this long and hotly contested trial."[4] Rule 4–324(a) is more earthbound than that. The objection that the State's evidence was not legally sufficient to support a verdict of second-degree murder has not been preserved.

### The Essential Pluralism Of Criminal Homicide

---

[3] In none of that "earlier" argument, moreover, was there any objection to instructing the jury on depraved heart murder. There was, moreover, no suggestion that a depraved heart murder instruction had not been generated by the evidence.

[4] The appellant does not even cite with any specificity what argument he may or may not have made in the course of that earlier discussion over jury instructions. He depends upon us to search those 50 pages of the transcript for him. That, however, is not our job.

Under the appellant's more ethereal and open-ended notion of issue preservation, some interesting, if vexing, questions might have been before us. The appellant's present argument would not have prevailed, however, even if it had been preserved. For the appellant to contend, as he now does, that the evidence was not legally sufficient to support a conviction for second-degree depraved heart murder is by no means to contend that the evidence was not legally sufficient to support a conviction for second-degree murder generally. The appellant obviously thinks about murder much too narrowly and too parochially.

Many crimes are widely embracing enough to be perpetrated by different modalities just as they may be explained by alternative and different theories of guilt. Such breadth of the core crime, however, does not fragment each different modality or each different theory of guilt into a different crime requiring distinct pleadings and yielding distinct verdicts. In a case of theft, for instance, the unlawful conversion of the victim's property may be effectuated by force or by stealth or by deceit or even by the receiving of stolen goods. That diversity, however, does not create separate crimes. It simply represents different ways of being guilty of the same indivisible crime of theft. Rice v. State, 311 Md. 116, 126, 136, 532 A.2d 1357 (1987) ("[Stealing and receiving stolen goods] are not autonomous offenses but rather one crime defined two ways" and therefore "Maryland's theft statute [does] not require the jury unanimity that [Rice] seeks.").

The same singularity of the underlying crime notwithstanding the multiplicity of its modalities has been recognized with respect to what was the common law crime of assault and is now the statutory misdemeanor of Assault in the Second Degree. Criminal Law

17

Article, Sect. 3–201(b); Watts v. State, 457 Md. 419, 434, 179 A.3d 929 (2018) ("In 1996, the General Assembly simply codified what the Court of Special Appeals in Lamb had already recognized—that second degree assault is a single crime that could be committed via different modalities."). See also Lamb v. State, 93 Md. App. 422, 613 A.2d 402 (1992), cert. denied, 329 Md. 110, 617 A.2d 1055 (1993).

So too is it with murder. To multiply the ways in which the crime may be committed is not to multiply the crime itself. There are no fewer than four separate mentes reae that are deemed blameworthy enough so that one with such a mens rea will be considered a murderer should the victim of his criminal conduct die. One such mens rea is the specific intent to kill. Smith v. State, 41 Md. App. 277, 398 A.2d 426, cert. denied, 284 Md. 748 (1979). A second murderous mens rea is the specific intent to inflict grievous bodily harm. State v. Ward, 284 Md. 189, 396 A.2d 1041 (1978). A third mens rea is the intentional perpetration or attempted perpetration of a life-endangering felony. Fisher v. State, 128 Md. App. 79, 736 A.2d 1125 (1999), aff'd in part, vacated in part, 367 Md. 218, 786 A.2d 706 (2001). A fourth murderous mens rea is the reckless and wanton disregard for human life that we shorthand with the phrase "depraved heart." Alston v. State, 101 Md. App. 47, 643 A.2d 468 (1994), aff'd, 339 Md. 306, 662 A.2d 247 (1995).

These are not four separate crimes. They do not have to be charged separately. They do not have to yield distinct verdicts. They are but alternative mental states for committing the same crime. Simply to charge the appellant with "murder" is ipso facto to charge him with all of its myriad manifestations and in all degrees, including manslaughter. See Wood v. State, 191 Md. 658, 665–68, 62 A.2d 576 (1948); Ross v. State, 308 Md. 337, 340–46,

18

519 A.2d 735 (1987); <u>McMillan v. State</u>, 181 Md. App. 298, 344–45, 956 A.2d 716 (2008), <u>rev'd on other grounds</u>, 428 Md. 333, 51 A.3d 623 (2012). The legal sufficiency or insufficiency of the evidence to prove one theory of guilt does not foreclose, therefore, the evidence's being legally sufficient to prove other possible theories of guilt. Alternative <u>mentes reae</u> may overlap. They are not mutually exclusive.

In the present case, on the morning of August 10, 2014, at 6915 Forest Terrace in Prince George's County or immediately outside it, the appellant was assaulted and severely beaten by Rashad Philpot and his friend Anthony. The appellant retreated from the scene, commandeered a loaded handgun from the car of a close friend, and returned immediately to 6915 Forest Terrace, hell-bent on retaliation and waving the gun as he approached. Once at the house, he fired six shots at the second story room that was Rashad's bedroom and in which the appellant then believed Rashad and his friend would still be found. Five of the bullets pierced the wall and ended up in the bedroom. A sixth bullet ricocheted off. One of the bullets killed the victim. The appellant's homicidal agency was undisputed. The only thing to be determined was his <u>mens rea</u>.

The appellant might have fired in hot-blooded rage in response to the provocation of an unprovoked assault or a mutual affray. He would at least have been entitled to try to prove that theory of extenuation. In any event, he may well, with or without mitigation, have fired with a specific intent to kill Rashad and/or Anthony. Whatever legal problem might be posed by the fact that Rashad and Anthony were not in the room, or even in the house, when the shots were fired could be easily resolved by the principle of transferred intent. <u>See generally Harvey v. State</u>, 111 Md. App. 401, 681 A.2d 628, <u>cert. denied</u>, 344

19

Md. 330, 686 A.2d 635 (1996). Whatever intent the appellant harbored toward Rashad and/or Anthony, as intended victims, would have been transferred to the three-year-old Knijah Bibb, the unintended victim who was hit and killed by one of the bullets that pierced the wall.

If, on the other hand, a less vengeful appellant had not specifically intended to kill Rashad and/or Anthony but had only intended to inflict serious grievous bodily harm on them, that same intent would have transferred to Knijah Bibb and the second-degree murder verdict would have been precisely the same as if his intent had been to kill. This was a second possible basis for a verdict of second-degree murder in this very case.

A third theory of murderous guilt might at that time have rested on the felony of first-degree assault as the predicate felony for second-degree felony murder under the then controlling law of Roary v. State, 385 Md. 217, 867 A.2d 1095 (2005). There would have been no problem in terms of the legal sufficiency of the evidence.

A fourth theory of possible guilt could have been that of depraved heart second-degree murder. To attempt to fire six bullets into a home the appellant had reason to believe was then occupied by no fewer than eight persons could easily have been found by a jury to be evidence of a reckless and wanton disregard for human life.[5] That verdict was a pat hand.

---

[5] Citing Dishman v. State, 352 Md. 279, 299–300, 721 A.2d 699 (1998), the appellant points to the blurred and ambiguous definitional borderline between second-degree depraved heart murder and manslaughter of the gross criminal negligence variety.

(continued . . . )

20

On his motion for a verdict of acquittal, the appellant did not challenge in any way the legal sufficiency of the State's evidence to support a verdict of second-degree murder under any of these possible theories of guilt. We have not been told that the State affirmatively disclaimed any theory of guilt. The jurors, moreover, need not automatically even have been unanimous in selecting a theory of guilt. Each of the four theories of possible guilt might have claimed the allegiance of no more than three jurors. All twelve would have been unanimous, however, in voting for guilt of second-degree murder and that is the only unanimity that matters. This would be precisely the sort of decisional diversity that this Court deemed to be permissible in Jeffries v. State, 113 Md. App. 322, 335–36, 688 A.2d 16, cert. denied, 345 Md. 457, 693 A.2d 355 (1997):

> A unanimous verdict of guilty of first-degree felony-murder would not be overturned even if it could be conclusively determined that six of the jurors stopped their analysis after concluding that the murder in question occurred in the course of an in-house robbery, five others analyzed it only in terms of a murder in the course of a burglary, and one lone juror (not sure that the victim had any money) reached the conclusion that the murder occurred in the course of an attempted robbery. The unanimous verdict would have been guilty of the single crime of felony-murder, and not three fragmented decisions with respect to three separate crimes of robbery-murder, burglary-murder, and attempted-robbery-murder.

---

( . . . continued)

If anything, this makes the State's case on the legal sufficiency of the evidence even stronger. In the present troubled state of our definitional law, it is for all intents and purposes impossible to imagine a body of evidence that would satisfy the burden of production for gross criminal negligence manslaughter that would not ipso facto also satisfy the burden of production for second-degree depraved heart murder.

21

In a variegated crime such as murder, one juror is by no means required to agree with other jurors as to the underlying theory of guilt any more than he or she is required to agree with the other jurors as to which State's witness he or she finds most persuasive and credible. The Supreme Court has long recognized this permissible diversity in the jurors' decisional process. See Schad v. Arizona, 501 U.S. 624, 631–32, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991). The permutations and possibilities are fascinating.

Regretfully, we are precluded from indulging in this rich analytic smorgasbord of Maryland homicide law by the foreclosing fact that the appellant has preserved nothing in this regard for appellate review. The challenge is not preserved, but it would not have prevailed even if, arguendo, it had been preserved.

## The Appellant Requests That We Notice Plain Error

The appellant's fourth contention is that Judge Hill gave the jurors an erroneous instruction on second-degree felony murder. The appellant at trial, however, lodged no objection to it. The appellant asks us to overlook his non-preservation and to take notice of plain error. In the exercise of our discretion, we decline to do so.

## Correcting A Clerical Glitch

The appellant finally contends that the record erroneously reflects that he was convicted of first-degree murder. He was not. He was acquitted of first-degree murder but convicted of second-degree murder. He asks that the record be corrected to show the true verdicts. The State fully agrees. We hereby direct the circuit court to correct the commitment record to show that the conviction was for second-degree murder and not for first-degree murder.

**COMMITMENT RECORD SHALL BE CORRECTED AS HEREIN DIRECTED; IN ALL OTHER RESPECTS, THE JUDGMENTS OF CONVICTIONS ARE AFFIRMED; COSTS TO BE PAID BY APPELLANT.**